Betty F. Brown GREENE, Plaintiff,

v.

**BRENTWOOD UNION FREE SCHOOL DISTRICT, et al., Defendants.**

No. 11–CV–4308 (SJF)(ARL).

United States District Court, E.D. New York.

Aug. 13, 2013.

Harriet A. Gilliam, Law Office of Harriet A. Gilliam, Riverhead, NY, for Plaintiff.

Lewis R. Silverman, Caroline Beth Lineen, Rutherford & Christie, LLP, New York, NY, for Defendants.

## *ORDER*

FEUERSTEIN, District Judge.

On September 8, 2011, plaintiff Betty F. Brown Greene ("plaintiff") commenced this action against the Brentwood Union Free School District (the "District"), the Board of Education of the District (the "Board"), Board members George Talley, Lorraine Pace, Stephen Coleman, and

Ronald Jimenez, Superintendent Donna Jones, and Assistant Superintendent Joan Lange (collectively, "defendants"), alleging that defendants discriminated and retaliated against her in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1983. [Docket Entry No. 1]. On December 19, 2012, defendants filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Docket Entry No. 49]. Now before the Court is the Report and Recommendation of Magistrate Judge Arlene R. Lindsay, dated April 9, 2013, recommending that defendants' motion for summary judgment be granted on the grounds that: (1) plaintiff has failed to establish a *prima facie* case of discrimination because the evidence offered does not demonstrate that she (a) suffered an adverse employment action or (b) was qualified for the position to which she was denied promotion; and (2) even if a *prima facie* case were established, she has failed to rebut the non-discriminatory reasons for her treatment offered by defendants. [Docket Entry No. 69] (the "Report"). Plaintiff has filed objections to the Report. [Docket Entry No. 70] ("Objections"). For the following reasons, plaintiff's objections are overruled, and the Court adopts Magistrate Judge Lindsay's Report in its entirety.

## I. Standard of Review

Rule 72 of the Federal Rules of Civil Procedure permits a magistrate judge to conduct proceedings of dispositive pretrial matters without the consent of the parties. FED. R. CIV. P. 72(b). Any portion of a report and recommendation on dispositive matters to which a timely objection has been made is reviewed *de novo*. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). However, "when a party makes only conclusory or general objections, or simply reiterates the original arguments,

the Court will review the report strictly for clear error." *Frankel v. City of N.Y.*, Nos. 06 Civ. 5450, 07 Civ. 3436, 2009 WL 465645, at *2 (S.D.N.Y. Feb. 25, 2009). The Court is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report and recommendation of a magistrate judge on a dispositive matter to which no timely objection has been made, the district judge need only be satisfied that there is no clear error on the face of the record. *See* FED. R. CIV. P. 72(b); *Johnson v. Goord*, 487 F.Supp.2d 377, 379 (S.D.N.Y.2007), *aff'd*, 305 Fed.Appx. 815 (2d Cir.2009); *Baptichon v. Nevada State Bank*, 304 F.Supp.2d 451, 453 (E.D.N.Y.2004), *aff'd*, 125 Fed. Appx. 374 (2d Cir.2005). Whether or not proper objections have been filed, the district judge may, after review, accept, reject, or modify any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

## II. Plaintiff's Objections

### A. Standard of Review

Plaintiff asserts that Magistrate Judge Lindsay applied the incorrect standard of review to the motion for summary judgment by "tak[ing] as undisputed most of the Defendants' Statements, notwithstanding the fact that plaintiff denied most of said Statement and submitted a Counter Statement of Facts." Objections at 7. Plaintiff therefore requests "that this Court conduct a de novo review of the entire record to ascertain issues of disputed fact necessary to overcome summary judgment, especially where the defendants' state of mind and intent are at issue." *Id.* at 5.

■ Magistrate Judge Lindsay applied the proper standard of review, stating that the parties' Rule 56.1 Statements were "construed in the light most favorable to the non-moving party" and that "[t]he facts set forth in [the] [R]eport are taken from either the uncontested facts in the defendants' Rule 56.1 Statement or the documentary evidence submitted by the parties in connection with [the] motion." Report at 2, n. 2. Magistrate Judge Lindsay also noted that "many of the exhibits annexed to counsel for the plaintiff's declaration are copies of the same documents produced by the defendants in support of their motion." *Id.* It is clear from the Report that Magistrate Judge Lindsay thoroughly considered the evidence presented, and plaintiff has failed to identify any specific statements by defendants that were improperly accepted as true or any evidence that was improperly ignored. Except insofar as plaintiff raises specific objections, which are addressed in further detail below, the Court will not undertake an independent *de novo* review of the record upon the basis of this conclusory objection. Therefore, the objection is overruled.

### B. Direct Evidence of Discriminatory Animus

Magistrate Judge Lindsay determined that plaintiff has failed to present direct evidence of Talley's discriminatory animus and that plaintiffs claims are therefore subject to the *McDonnell Douglas* burden-shifting test. Report at 15; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). Plaintiff argues that she has offered direct evidence of Talley's dis-

criminatory animus, including: (1) O'Brien's deposition testimony that "he has no reason to disbelieve" Frank Scimeca's statement in an affidavit that Talley had made racially discriminatory comments in the past; and (2) Jones' deposition testimony that she believed Talley had made racially discriminatory statements about her. Objections at 7–8.

■ "[T]he evidence proffered by the party opposing summary judgment must be of a type that would be admissible at trial." *Cerqua v. Stryker Corp.*, No. 11 Civ. 9208, 2013 WL 1752284, at *4 (S.D.N.Y. Apr. 23, 2013), and therefore "hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in the Rule 56(e) affidavit," *Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir.1986) (internal quotation marks and alterations omitted); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985) ("[The non-moving party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial.") (citations omitted). Magistrate Judge Lindsay correctly found that "[t]he testimony of O'Brien and Jones commenting on the affidavit of a co-worker in which he reiterates derogatory statements allegedly made by Talley is inadmissible hearsay," and therefore does not constitute direct evidence of Talley's discriminatory animus. Report at 18. Although plaintiff argues that "the reference to the affidavit of Scimeca should have been considered as further evidence of Talley's propensity for making discriminatory remarks about African Americans and women since it is a sworn affidavit," Objections at 8, she only offered as evidence the testimony of O'Brien and Jones about Scimeca's affidavit, not the affidavit itself. The Court also agrees with Magistrate

Judge Lindsay that, even if there were admissible evidence of Talley's past comments, they are "not probative of the defendants' motive for taking action against Greene," Report at 18, because the comments are "remote and oblique ... in relation to the employer's adverse action," *Tomassi v. Insignia Fin. Grp., Inc.,* 478 F.3d 111, 115 (2d Cir.2007), *abrogated in part on other grounds* by *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).

Plaintiff also relies upon O'Brien's testimony that he heard Talley make a comment about Christopher Dowdy's race when he applied for a position as an Assistant Principal and argues that Magistrate Judge Lindsay erred in deeming the comment about Dowdy a "'stray remark' not aimed at [plaintiff]" and thus not probative of Talley's discriminatory intent in this case. Report at 17 n. 19. Plaintiff notes that the Second Circuit has held that "stray remarks" should be considered in the context of all the evidence to determine whether they may support a reasonable inference of discriminatory animus and not "first ... categorized either as stray or not stray and then disregarded if they fall into the stray category." *Tomassi,* 478 F.3d at 116.

Magistrate Judge Lindsay's finding that Talley's comment about Dowdy did not support a reasonable inference of discriminatory animus in this case was not based upon a rigid characterization of the comment as "stray" or "not stray," but rather was consistent with the Second Circuit's guidance that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Id.* at 115; *see also Henry v. Wyeth Pharm., Inc.,* 616 F.3d 134, 149 (2d Cir.2010) ("In determining whether a remark is probative, [district courts in

the Second Circuit] have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."). The Court agrees with Magistrate Judge Lindsay that Talley's comment about Dowdy was too remote and oblique in relation to his actions in this case to constitute direct evidence of his discriminatory animus. *See, e.g., Adam v. Glen Cove Sch.,* No. 06–CV–1200, 2008 WL 508689, at *8 (E.D.N.Y. Feb. 21, 2008) ("[T]he alleged isolated remarks by Jimmy and Familetti when considered in the context of all the evidence, are too 'remote and oblique ... in relation to the employer's adverse action' to permit a reasonable jury to find for plaintiff."); *Brollosy v. Margolin, Winer & Evens, LLP,* No. 04–CV–0873, 2006 WL 721433, at *10 (E.D.N.Y. Mar. 20, 2006) ("In order for the remarks to be deemed significant, the plaintiff must show their nexus to the adverse employment decision.").

Plaintiff also asserts that she "established that defendant Talley engaged in racial slurs through the direct testimony of O'Brien, who [sic] when questioned about statements that Talley made to Frank Sciemeca [sic], as set forth in a sworn affidavit, stated that he had no reason to disbelieve Mr. Sciemeca's [sic] sworn statement that Talley referred to defendant Jones as 'black bitch.'" Objections at 8. O'Brien's unsupported belief about whether the statements were made does not constitute admissible evidence.

■ Lastly, plaintiff argues that she "provided evidence[, in the form of a chart prepared by defense counsel listing other

complaints of discrimination against the District and Talley, Report at 19,] that Talley has been the subject of numerous complaints [t]o the NYS Division of Human Rights and EEOC regarding allegations of race discrimination." Objections at 8. This evidence is inadmissible hearsay. *See* Report at 19 ("While[ ] the direct testimony of other employees about their treatment by the defendants may be relevant to the issue of the employer's intent, the complaints, themselves, are also inadmissible hearsay.") (citation omitted).

For the foregoing reasons, Magistrate Judge Lindsay did not err in concluding that plaintiff has failed to show direct evidence of discriminatory animus, and plaintiff's objection is overruled.

### C. Constructive Discharge

Plaintiff argues that Magistrate Judge Lindsay "erred in declining to find that plaintiff had experienced the adverse employment action of constructive discharge" by "treat[ing] as one action plaintiff's forced resignation/retirement and the separate action in denying her tenure." Objections at 9. According to plaintiff, "the testimony of Jones, as well as the documentary evidence of tenure reports to the Board establish that the District was considering plaintiff's tenure well before the Nunez incident" in November 2008. Objections at 9–10.

The portions of the record cited by plaintiff do not support this assertion. *See* Report at 23 ("There is not a shred of evidence suggesting that before the Nunez incident, the Board had already begun to consider Greene's eligibility for tenure or that their desire to deny her of that privilege somehow influenced Jones decision."). In fact, the evidence shows that plaintiff was not eligible to be considered for tenure until August 2009. *See* [Docket Entry No. 57–4]; Deposition of John Agostini [Docket Entry Nos. 53–6, 53–7] at 121:12–17 ("[T]hese are the people notified in November that the following September these people would be tenure eligible. It's just an alert that it would be coming up for a vote at some point during the year.").

■ Plaintiff further argues that she "clearly submitted that the verbal reprimands by Lange and Jones, the written reprimand by Jones, the persistent threats of termination with the representation that it would be carried out; the persistent ultimatums by Jones that either plaintiff retire or she will be terminated; and the forced termination/resignation all constituted ... the adverse employment action of constructive discharge." Objections at 10 (citing Complaint ¶¶ 81–93). Magistrate Judge Lindsay addressed this argument, finding that "the record indicates that these actions did not ... create the type of atmosphere that would have compelled a reasonable person in Green's shoes to resign." Report at 24; *see Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir.1993) ("[A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (internal quotation marks omitted). According to plaintiff, this finding is "contrary to the body of decisional law that recognizes that threats of termination can be of the utmost importance when alleged in the context of a constructive discharge claim," and "a 'triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired.'" Objections at 11 (quoting *Rupert v. City of Rochester Dep't of Envtl. Servs.*, 701 F.Supp.2d 430, 440 (W.D.N.Y.2010)

(declining to decide whether the plaintiff was constructively discharged and instead granting summary judgment to the defendant because the plaintiff failed to raise a triable issue of fact as to pretext) (citing *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987) ("The record in this case amply demonstrates that Lopez has raised a genuine issue of fact as to whether he was constructively discharged when, as he alleges, Hunsberger told him he would be fired at the end of the 90–day probationary period no matter what he did to improve his allegedly deficient performance.")); *see also Murray v. Town of N. Hempstead*, 853 F.Supp.2d 247, 270 (E.D.N.Y.2012) ("Although threats of termination alone have occasionally been held to be sufficient to permit a rational trier of fact to find that a reasonable person in the employee's shoes would have felt compelled to resign, those cases involved a direct and/or repeated threats from the employer, along with some other adverse conduct.").

Plaintiff's argument fails because the evidence does not show that she was given the choice to resign or be fired; plaintiff "could have waited for Jones['] explanation [of why she was recommending plaintiff's termination] and submitted a response directly to the Board before submitting her resignation" instead of "cho[osing] to respond to the allegations fifteen days after she had already submitted her notice of resignation." Report at 24. The Court finds no error in Magistrate Judge Lindsay's determination that "[t]he only action taken by the defendants was Jones' recommendation to terminate Greene's employment" and that, because "Jones ... was not the final decision maker," plaintiff had an opportunity to respond but chose to resign instead. Report at 23; *See Weisbecker v. Sayville Union Free Sch. Dist.*, 890 F.Supp.2d 215, 234 (E.D.N.Y.2012) ("With respect to Jones' recommendation to the Board that plaintiff be terminated as a probationary teacher, based on the evidence in the record in this case, this was not an adverse employment action as a matter of law[,] ... [because] (1) the recommendation was made by Jones, who was not the final decision maker with respect to termination, (2) plaintiff was notified of the recommendation of termination well in advance of the Board's meeting, and (3) plaintiff was afforded extensive process ... to request Jones' reasons for the recommendation and provide a responsive statement to the Board."); *see also Bailey v. N.Y.C. Bd. of Educ.*, 536 F.Supp.2d 259, 266 (E.D.N.Y.2007) ("[W]hen an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge."); *Silverman v. City of N.Y.*, 216 F.Supp.2d 108, 116 (E.D.N.Y. 2002) ("[T]he fact that [the plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him but one choice: resignation."); *Stembridge v. City of N.Y.*, 88 F.Supp.2d 276, 286 (S.D.N.Y.2000) ("[P]laintiff had the opportunity to present his side of the story in the scheduled disciplinary hearing. It is impossible to know whether the hearing could have actually remedied the situation or addressed the ... misconduct because plaintiff chose not to participate in the process.").[1]

---

**1.** Plaintiff asserts, without explanation, that Magistrate Judge Lindsay "incorrectly determine[d] that plaintiff resigned before Jones and the Board could act on Jones' recommendation to terminate plaintiff, and therefore there was no adverse reaction." Objections at 10. The record demonstrates that plaintiff submitted her resignation on February 5, 2009, prior to the February 25, 2009 Board meeting at which Jones planned to recommend plaintiff's dismissal. Report at 11.

Moreover, even if plaintiff was constructively discharged prior to her resignation, the issue is irrelevant to the ultimate disposition of the motion in light of the Court's adoption of Magistrate Judge Lindsay's conclusion, discussed in further detail below, that defendants had a legitimate, non-pretextual reason for terminating her. Therefore, the objections are overruled.

### D. Qualification for Promotion

██ With respect to the failure to promote claim, Magistrate Judge Lindsay found that plaintiff failed to establish a *prima facie* case of discrimination because the evidence showed that the position began after the effective date of plaintiff's retirement and that she was therefore not qualified for the position. Report at 24–25. Plaintiff repeats the argument made below that her retirement was not a bar to the position because she was not retired at the time she submitted her application, and that defendants could have rescinded their decision to accept her retirement. Objections at 13. Magistrate Judge Lindsay correctly disposed of these arguments, finding that plaintiff's retired status as of the start of the position was dispositive and that her status as of the date she submitted her application was irrelevant. Report at 25–26. The remainder of plaintiff's objections to the recommended dismissal of this claim only repeat the original arguments made below and are without merit. *See Frankel*, 2009 WL 465645, at *2 ("[W]hen a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error."). Therefore, the objections are overruled.

### E. Pretext

Plaintiff objects to Magistrate Judge Lindsay's finding that, even if plaintiff es-tablished a *prima facie* case of discrimination, her claims would nonetheless fail because "defendants have articulated [ ] nondiscriminatory reasons for their actions and there is no evidence of a pretext." Report at 26. Plaintiffs objection repeats the same arguments she made in opposition to the motion for summary judgment, *i.e.,* that plaintiff should not have been found at fault in the Nunez incident and that there was a difference of opinion among her supervisors and Board members regarding whether dismissal was a proper sanction for her conduct. Objections at 13–15.

The Court has reviewed Magistrate Judge Lindsay's findings and agrees that, viewing the record as a whole and construing all ambiguities in plaintiff's favor, no reasonable juror could conclude that defendants' stated reason for plaintiff's treatment was pretextual and that discriminatory animus was a motivating factor. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 446 (2d Cir.1999) ("The defendant's burden of production [to articulate a legitimate, nondiscriminatory reason for its actions] is not a demanding one; she need only offer such an explanation for the employment decision. . . . [T]he ultimate burden of persuasion remains always with the plaintiff."). Defendants' investigation concluded that plaintiffs conduct in the Nunez incident was irresponsible and dangerous, and plaintiff has failed to offer evidence to support the conclusion that the conclusion was pretextual. *Dister v. Continental Grp., Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988) ("Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons."). Therefore, plaintiff's objection is overruled.

### F. Disparate Treatment

Plaintiff objects to Magistrate Judge Lindsay's finding that plaintiff "has not

offered sufficient evidence to support her contention that she was treated differently with respect to the disciplinary measures than other similarly situated employees." Report at 30; Objections at 15. As plaintiff acknowledges, "there must be an 'objectively identifiable basis for comparability' between the plaintiff and the comparator employee, which includes an assessment of 'whether the conduct for which the employer imposed discipline was of comparable seriousness.'" Objections at 15 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000)). The Court finds that Magistrate Judge Lindsay thoroughly considered plaintiff's proffered comparators with respect to disciplinary treatment and properly determined that they are not similarly situated to plaintiff.

With respect to plaintiff's claim that she was subjected to disparate treatment in being denied the promotion, Magistrate Judge Lindsay found that: (1) plaintiff failed to present evidence that the employees interviewed for the position had, like plaintiff, "engaged in conduct that should have [a]ffected their employment prospects"; (2) Escobores provided sworn testimony that he withdrew his application for the position due to personal commitments, not due to pressure from Talley to make way for a white candidate; (3) plaintiff's own assessment of her work experience did not establish that she was more qualified for the position than Farnetti; and (4) diversity in the District's hiring undermined any inference of discrimination. Report at 33–34. Plaintiff argues that Magistrate Judge Lindsay erred in relying upon hiring data through 2011, two (2) years after plaintiff's retirement, in determining that the diversity of defendant's administrators undermined any inference of discrimination. Objections at 19. The data showed that "from 2004 to 2011, the District hired nineteen minority individuals as principals and assistant principals," Report at 34, and the inclusion in this data of individuals hired after plaintiffs retirement does not diminish the weight of the evidence. Moreover, even if consideration of this data was improper, plaintiff's claim nonetheless fails due to the absence of evidence supporting an inference of discrimination. The remainder of plaintiff's objections only repeat her original arguments, and the Court finds no clear error in Magistrate Judge Lindsay's findings. Therefore, plaintiff's objections are overruled.

### G. Retaliation

 To present a *prima facie* case of retaliation, a plaintiff must present evidence sufficient to permit a rational trier of fact to find that (1) the employee engaged in conducted protected under Title VII, (2) the employer was aware of the protected activity, (3) the employer took adverse action against the employee, and (4) a causal connection exists between the protected activity and the adverse action. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir.2006); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir.2001)). Magistrate Judge Lindsay found that plaintiff has failed to present evidence sufficient to find that defendants took adverse action against her in retaliation for any protected activity, stating that "[t]he record is devoid of evidence that the defendants limited [plaintiff's] duties or responsibilities after she complained about discriminatory behavior" or that she was subjected to a hostile work environment. Report at 36–37.

Plaintiff's objection to the recommended dismissal of her retaliation claim does not address Magistrate Judge Lindsay's finding that there is no evidence that she was subjected to the claimed adverse employment actions. Instead, plaintiff only ar-

gues that Magistrate Judge Lindsay erred in doubting the veracity of plaintiff's testimony that she told Jones, Lange and O'Brien that "she felt that she was being discriminated against ... set up, because [she] would have been the first African–American principal on the high school level." Objection at 19–20; Report at 35 (stating that "the meeting(s) with Jones, Lange and O'Brien occurred before February 5, and the notice for the position as EHS Principal was not posted until March"). Even if plaintiff was aware that the principal position would be available before it was posted and raised her concerns about discrimination at the meeting, the issue is irrelevant to Magistrate Judge Lindsay's basis for recommending dismissal of the claim, *i.e.*, that there is no evidence that defendants took adverse action against plaintiff in retaliation for her complaints. Objections at 19–20. Because plaintiff has failed to address this issue in her objections, the Court is only required to review the finding for clear error and finds none. Therefore, plaintiff's objection is overruled.

### H. Sections 1981 and 1983

Given plaintiff's failure to present evidence of a constitutional violation, she cannot sustain a claim pursuant to sections 1981 or 1983, and the objections to the recommended dismissal of these claims are overruled.

### I. Remaining Objections

To the extent that plaintiff has raised objections not specifically addressed above, the Court has determined that they are either reiterations of her original arguments or are not sufficiently specific to

trigger *de novo* review of Magistrate Judge Lindsay's conclusions. The Court has reviewed the Report in its entirety and is satisfied that there is no clear error on the face of the record, and therefore any remaining objections are denied.

### III. Conclusion

For the foregoing reasons, Magistrate Judge Lindsay's Report is adopted in its entirety as an order of the Court. Defendant's motion for summary judgment [Docket Entry No. 49] is granted and plaintiff's complaint is dismissed with prejudice. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

LINDSAY, United States Magistrate Judge:

The plaintiff, Betty F. Brown Greene ("Greene"), commenced this action against the defendants, the Brentwood Union Free School District (the "District"), the Board of Education of the Brentwood Union Free School District (the "Board"), Board members George Talley ("Talley"), Lorraine Pace ("Pace"), Stephen Coleman ("Coleman"), and Ronald Jimenez ("Jimenez"), Superintendent Donna Jones ("Jones") and Assistant Superintendent Joan Lange ("Lange"), alleging that they discriminated against her on the basis of her race, gender and religion and retaliated against her for opposing the discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and the Equal Protection Clause as made actionable by 42 U.S.C. § 1983.[1] Before the court, on referral from District Judge Feuerstein, is the de-

---

**1.** In her complaint, Greene also asserted a claim pursuant to § 296 of the New York Human Rights Law. In her opposition to the defendants' motion to dismiss, Greene indi- cated her intent to withdraw that claim. Accordingly, it is recommended that her § 296 claim be dismissed.

fendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth herein, the undersigned recommends that the defendants' motion for summary judgment be granted.

## BACKGROUND

The following facts, drawn from the Complaint and the parties' Local Civil Rule 56.1 Statements, are construed in the light most favorable to the non-moving party, except as otherwise noted.[2] *See Capobianco v. City of New York*, 422 F.3d 47, 50 n. 1 (2d Cir.2005).

### A. Greene's Employment History

The plaintiff is an African–American woman who was hired by the District as a high school home economics teacher in 1978. Defs. 56.1 Statement at ¶ 1. The defendant Talley is a Caucasian man who became a member of the Board in 2003 and was President of the Board from 2008–2009. *Id.* at ¶¶ 4, 5. Pace is a Caucasian women who became a member of the Board in 2007 and was Vice–President of the Board from 2008–2009. *Id.* at ¶¶ 6, 7. Coleman is a Caucasian man who was a member of the Board from 1991 to 2012. *Id.* at ¶ 8. Jimenez is a Hispanic man who served as a member of the Board from July 2008 to June 2011. *Id.* at ¶ 9. Superintendent Jones is African–American woman. *Id.* at ¶ 2. She served as Superintendent of the District from 2007 to June 2010. *Id.* Assistant Superintendent Lange is a Caucasian woman. *Id.* at ¶ 3. She was the Assistant Superintendent for Second-

ary Education from June 2007 to August 2011. *Id.*

In 1998, Greene was promoted to the position of Teacher on Special Assignment/Dean of Students. *Id.* at ¶ 11. In 2006, she was promoted to the position of Assistant Principal for the Evening High School/Adult Education Program ("EHS"). *Id.* at ¶ 12. The Assistant Principal position had a probationary term from August 11, 2006 to August 10, 2009. *Id.* at ¶ 13. She maintained her position until July 1, 2009. *See* Complaint at ¶ 19.

Greene was appointed to the Assistant Principal position by interim Superintendent of Schools Michael Cohen. *See* Silverman Decl. at Ex. D at 18:5. Although Greene alleges in her complaint that she was the first African–American in twenty-five years to hold an assistant principal position at the high school level, *see* Complaint at ¶ 22, Greene does not deny that from 2004 to 2011, the District hired nineteen other minority individuals as principals and assistant principals. Defs. 56.1 Statement at ¶ 93. Of these nineteen individuals, ten individuals are African–American. *Id.* at ¶ 94. From 2008 to 2011, the District also appears to have employed twenty-three females as principals or assistant principals. *See* Silverman Decl. at Ex. OO, Resp. 2.

In her capacity as Assistant Principal for the EHS, Greene was responsible for four program areas: the Adult Education Program; the Summer School; English as a Second Language; and Records Retention. Complaint at ¶ 21. Her immediate supervisor was Denis Bracco ("Bracco"),

---

**2.** The facts set forth in this report are taken from either the uncontested facts in the defendants' Rule 56.1 Statement or the documentary evidence submitted by the parties in connection with this motion. The court notes that the plaintiff has attempted to supplement most of the facts set forth in the defendants' Rule 56.1 statement in order to support her own contentions. It should also be noted that many of the exhibits annexed to counsel for the plaintiff's declaration are copies of the same documents produced by the defendants in support of their motion.

the Principal of the EHS. *Id.* at ¶ 24. Greene was the only administrator on duty from 3:00 p.m. to 6:00 p.m. *Id.* at ¶ 23.

During the course of her employment, Greene received good performance reviews, was never the subject of any formal or informal disciplinary proceeding, and was recognized for her contributions to the District, in particular to the EHS Program. *Id.* at ¶¶ 25, 26. On June 4, 2008, Greene received her last annual evaluation. *Id.* at ¶ 30. In the evaluation, Bracco stated, among other things:

> Your knowledge, skills and experience that you attain have continued to benefit the Evening High School, Summer High School and Continuing Education Programs. You take your responsibilities very seriously and you are an effective administrator. . . .
>
> During the past school year you continued to successfully demonstrate you leadership abilities in dealing with students and staff. . . .
>
> You are poised and calm under pressure. . . .
>
> You continue to follow proper procedure and protocol. . . .

Gilliam Decl. at Ex. E.[3]

On November 7, 2008, Greene was notified that she would become eligible for tenure consideration during the 2009/2010 school year. *See* Gilliam Decl. at H. The notice indicated that the supervisor would be meeting with her regarding a tenure evaluation and discussing her attendance during the probationary period. *Id.* Greene's name was then added to the Certified Personnel Appointment listing indicating that she was a tenure candidate "effective 9/1/09–6/30/10." *Id.* at Ex. Q.

## B. The November 12, 2008 Incident

On November 12, 2008, while Greene was still a probationary employee, Alexandria Nunez ("Nunez"), a tenth grader at Brentwood High School, stayed after school with a friend. Defs. 56.1 Statement at ¶¶ 14, 17. Nunez had just returned to school that day after undergoing a tonsillectomy. *Id.* at ¶¶ 15–16.[4] While she was watching her friend ("K") at jazz orchestra, Nunez began coughing up blood. *Id.* at ¶ 17. Silverman Decl. at Ex. T, p. 662. K alerted Theresa Poland, a teacher at the school, who immediately left the room to advise Greene that a student was vomiting blood. *Id.* at ¶¶ 19–20; Silverman Decl. at Ex. T, p. 714.

In the meantime, K called Nunez's mother and reported that her daughter was spitting up blood. *Id.* at ¶¶ 21–22; Silverman Decl. at Ex. T, p. 662. Mrs. Nunez told K to call an ambulance and immediately drove to school. *Id.* at ¶¶ 22–23.[5] As soon as Greene was alerted to the situation, she and Poland, joined by

---

**3.** The plaintiff and defendants have both utilized letters to identify their exhibits. Accordingly, the exhibits can only be distinguished in this report by reference to the moving declarations.

**4.** Greene contends that she had not been made aware of Nunez's condition by the building administrator or the nurse and, at the time of the investigation, the District did not have any information about the nature of her surgery. Pls. 56.1 Counter–Statement at ¶¶ 15–16.

**5.** Greene does not dispute that Mrs. Nunez was called or that she had instructed K to call the ambulance. However, she does assert that any facts gleaned from Nunez's deposition should be disregarded in connection with her claims because it was not considered by Jones or Lange during the investigation. Pl's 56.1 Counter–Statement at ¶ 19. Although the defendants have referred to Nunez's deposition transcript in their 56.1 Statement, the defendants have also referenced Dr. Lange's investigation notes, which contain the same information.

a security guard, went to the music wing to find Nunez.[6] *Id.* at ¶ 24, Pl. 56.1 Counter–Statement at ¶ 20. When they arrived, Nunez was no longer throwing up blood. *See* Silverman Decl. at Ex. T, p. 658, 662.

According to K's version of the events, when Greene arrived at the music wing, K was in the process of calling 911. *See* Silverman Decl. at Ex. T. Greene appeared angry. *Id.* When K explained she was calling an ambulance, Greene told her "no," so she hung up the phone.[7] *Id.* Greene told the girls to accompany her to the front office and Nunez advised Greene that her mother was on the way. *Id.* at ¶¶ 28–29. At approximately 4:44, while the girls were walking to the front office, 911 called back.[8] *See also* Silverman Decl. at Ex. T. K explained to the operator that her friend was throwing up blood. *Id.* When the operator asked K if she needed assistance, K said "I don't know." *Id.* K indicated during her interview that she did not know what to say to the operator because Mrs. Nunez had told her to call the ambulance but Greene had told her to hang up the phone. *Id.* K, nonetheless, remained on the phone and the ambulance asked for the address of the school, which she did not know. *Id.* K recalls that when she then asked Greene for the address, Greene rolled her eyes and said "26th Ave-

nue" and then asked her for Mrs. Nunez' telephone number. *Id.*

·Greene's recollection concerning how she learned that an ambulance had been called is somewhat inconsistent. The day after the incident, Greene reported that K had informed her that Nunez's mother had instructed her to call an ambulance. *See* Silverman Decl. at Ex. T, p. 658. A few days later, during her interview, Greene repeated that K had reported that she had called the police, but she also said she "had no clue if the police had been contacted." *See* Silverman Decl. at Ex. T.[9] In her 56.1 Counter–Statement, Greene states that the security guard advised her that the police and EMS had been called. Pl. 56–1 Counter–Statement at 28. In any case, Greene's "best recollection" is that she never told K to hang up the phone. *See* Silverman Decl. at Ex. T.

Mrs. Nunez arrived at school at the same time as the ambulance. *Id.* at ¶ 30. According to Mrs. Nunez, Greene had phoned her before her arrival to say she was not going to be able to call an ambulance because they would not take Nunez without her being present at school.[10] *See* Silverman Decl. at Ex. T. Mrs. Nunez also reported that when she arrived at school, K was very mad because "all Mrs. Greene cared about was [whether] there [was] going to be a lawsuit." *Id.* Mrs. Nunez asked the security guard "who at school

---

**6.** There was no nurse on duty at the time of the incident. Defs. 561. Statement at ¶ 25–26.

**7.** On the way to the hospital, K relayed the events to Mrs. Nunez. K reported that Greene had told her to hang up the phone because she wasn't supposed to use a cell phone in school. Silverman Decl. at Ex. P, 25:22. K further reported that when the police called back, Greene again advised her to hang up but she said "No." *Id.* at 27:7–21; *see also* Silverman Decl. at Ex. T.

**8.** According to Nunez' phone records, the first call to 911 was made at 4:42, which

confirms that Greene immediately walked the girls to the front office.

**9.** The page references have been cut off of the copy provided to the court.

**10.** Greene disputes that she told Mrs. Nunez that she could not call an ambulance; rather she contends that she told Mrs. Nunez that in accordance with District protocol she was calling to advise her that her daughter was ill and an ambulance was on its way. Pl. 56.1 Counter–Statement at ¶ 45.

was concerned about a lawsuit" and his answer was "it wasn't me, it was her, meaning Mrs. Greene." *Id.* The security guard recalls that he called Greene and asked her to come back [to where they were standing] and help and when Greene returned Mrs. Nunez yelled "I know you try to help these students a lot and I am not the type to sue however you should have called the police." *Id.*

As soon as Nunez was placed in the ambulance, she started throwing up blood again. *Id.* at ¶ 31. Nunez was admitted for a one night stay and lost two liters of blood. *Id.* at ¶ 33. Greene then reported the incident to Bracco. *Id.* at ¶ 34.[11]

## C. Mrs. Nunez's Complaint and the Investigation

The day after the incident, Mrs. Nunez called the Principal of the high school to lodge a complaint. Defs. 56.1 Statement at ¶ 36. The Principal said he would get back to her but he didn't. *Id.* at ¶ 35. Mrs. Nunez then called Pace, who she had met when her daughter was in the competitive marching band. *Id.* at ¶ 36. Pace told her to call the school again and that someone would get back to her. *Id.* at ¶¶ 36–37. Pace, along with George Talley, then informed Jones about the incident and asked her to conduct an investigation. *See* Gilliam Decl. at Ex. MMM, 151:22. In response to their request, Jones met with Mrs. Nunez and directed Assistant Super-

intendent Lange to investigate the matter. *Id.* at ¶¶ 39, 40.

During the investigation, Lange interviewed Greene[12], Nunez, K, Mrs. Nunez, Ms. Poland, two security guards and Nunez's doctor. *Id.* at ¶ 42[13]; Silverman Decl. at Ex. T. Lange also reviewed written statements from Greene and Poland. *Id.* at ¶¶ 43–44. At the conclusion of the one week investigation, Lange prepared a memorandum for Jones in which she reported that she too had received a call from Mrs. Nunez "regarding the alleged mishandling of a medical emergency." *See* Silverman Decl. at Ex. V, 655. Lange indicated that during a series of interviews "one of which included the examination of calls made on [Nunez's] cell phone]," she confirmed the following events:

- K immediately called her [own] mother ("because she used to be a nurse") whose instructions were to call [Nunez's] mother right away.

- K called [Nunez's] mother who directed her to call an ambulance.

- K called 911 and requested an ambulance.

- K hung up and several minutes later received a return call from 911.

- K also went to Ms. Theresa Poland, one of the club advisors. Ms. Poland left immediately to find an administrator. Ms. Poland returned to the scene with Ms. Greene, the administrator assigned to after school hours,

---

11. The parties dispute whether Greene ever reported the incident to Central Administration. *Id.* at ¶ 34; Pl. 56.1 Counter–Statement at ¶ 34. The defendants contend that Greene never reported the incident. Defs. 56.1 Statement at ¶ 34. Greene contends that Bracco advised her to provide a written report to Dr. Lange and that she personally delivered the report to Central Administration. Pl. 56.1 Counter–Statement at ¶ 34. A copy of Greene's report dated November 13, was, in

fact, stamped by the Assistant–Superintendent that day. *See* Silverman Decl. at Ex. T, p. 658.

12. Greene was interviewed in the presence of her union representative, O'Brien. Defs. 56.1 Statement at ¶ 42.

13. Lange may have spoken to the doctor after she issued her investigative report. Pl. 56.1 Statement at ¶ 42.

a security guard and a night custodian who was in the area. (Please note that the security guard had not been called but rather was spotted in the area and asked to accompany Ms. Greene and Ms. Poland.)[14]

*Id.* Lange also reported that according to Greene, "You could see blood on the student's ID and there was a lot of blood in the garbage can outside the music classroom." *Id.* Lange further reported:

Ms. Greene instructed the two girls to follow her to the Sonderling front office. When [I] asked if an ambulance had been called, Ms. Greene replied, "I had no clue."

Ms. Greene did contact Ms. N when they arrived at the Sonderling front office. She informed Ms. N that she could not call an ambulance until the mother arrived at the school.

Please note that all administrators know that our protocol if the parent is unavailable is to instruct the parent to meet the child at the hospital. A staff member accompanies the student to the hospital.

K reported that Ms. Greene appeared to be upset that she (K) had called the ambulance and in fact directed her to hang up. . . .

*Id.* at 656. Lange concluded her report by stating:

I am deeply concerned regarding Ms. Greene's response to a situation where she admitted seeing a lot of blood from a student who told her she was throwing up blood. Although administrators do not have medical backgrounds, we are

trained to make quick decisions regarding the health, safety and welfare of our students. To walk a student who has just thrown up "a lot of blood" to the Sonderling front office was a poor decision.

I recommend Ms. Greene receive a letter of discipline directing her to very different actions in future medical emergencies.

*Id.*[15] Lange reported the results of her investigation to the Board of Education in an Executive Session. Defs. 56.1 Statement at ¶ 52.

**D. Jones' Recommendation and Greene's Subsequent Resignation**

Upon receipt of the report, Jones was conflicted about what action to take because Greene had been an employed by the District for many years, had a record of good performance, her family lived in the community, and she had been a good advocate for children. *Id.* at ¶ 53. However, the investigation had called into question Greene's judgment. *Id.; see* Gilliam Decl. at MMM, 156:19–157:12. In addition, Jones had received reports indicating that Greene had shown no remorse for the incident despite the fact that there were serious concerns of poor judgment that could have led to a very serious situation involving the child. *See* Gilliam Decl. at MMM, 160:18. Jones would have been comfortable adopting Lange's recommendation, but Talley and Pace felt strongly that Greene needed to be terminated because she had endangered the life of a child. *Id.* at 162:12–24; *see also* Def. 56.1

---

14. Lange's parenthetical comment appears to be in response to Greene's position that she followed protocol concerning medical emergencies, which required her to alert security, not to call an ambulance. *See* Pl. 56.1 Counter–Statement at ¶ 26, Ex. M; *see also* Pl. Opp. at 20.

15. Greene disputes telling Lange that she did not know if an ambulance had been called. She also contends that she told Lange in the interview that she had been advised by the student and security that an ambulance had been called. Pl. 56.1 Counter–Statement at ¶ 47.

Statement at ¶ 54. Accordingly, on November 24, 2008, Jones decided to recommend Greene's termination and orally advised Greene of her decision. *Id.* at ¶ 55. O'Brien, who was present at the meeting, asked Jones to consider a lesser penalty such as referring Greene to training or extending Greene's probationary appointment, but Jones refused. Gilliam Decl. at MMM, 177–78.

Following the meeting, O'Brien met with Greene on numerous occasions to discuss her option of resigning rather than being terminated, which Greene would not consider. *Id.* at ¶ 57. Accordingly, on January 22, 2009, two months after the incident, Jones finally advised Greene in writing that she would be recommending Greene's termination at the February 25, 2009 board meeting. *Id.* at ¶ 58; Silverman Decl. at Ex. X. Upon receipt, Greene mailed Jones a written statement setting forth her credentials as well as her ties to the community and requesting that Jones provide her with the reasons for her recommendation. Silverman Decl. at Ex. Y. However, on February 5, before Jones could respond, Greene changed her mind and submitted her resignation to the Board, indicating that she was "retiring with all the due benefits provided in the B.P.S.O. contract." *Id.* at AA.

On February 12, 2009, Jones nonetheless responded to Greene's request for the reasons for her recommendation. *Id.* at ¶ 60. In her letter, Jones indicated that she had intended to make the recommendation because Greene had "used poor judgment that endangered the life of a student." *Id.* at ¶ 60; *see* Silverman Decl. at Ex. Z. Thereafter, on February 25, 2009, the Board voted to accept Greene's resignation effective July 1, 2009. *Id.* at

¶ 64. As a result, the Board never voted on whether to accept Jones' recommendation to terminate Greene. *Id.* at ¶ 63.

## E. Greene's Subsequent Application for the Principal Position

Less than one month later, the District posted a notice for the position of Principal of the Evening High School effective July 1, 2009, with an application cut-off date of March 26, 2009.[16] *Id.* at ¶ 67; Silverman Decl. at Ex. EE. On March 25, 2009, Greene submitted an application for the position but was not interviewed. Def. 56.1 Statement at ¶ 69. Anthony DeConstanzo and Bergre Escorbores, who also applied for the job, were interviewed. *Id.* at ¶ 71. In May, the District re-posted the notice. *Id.* at ¶ 73. The notice indicated that former applicants need not re-apply for consideration and that the re-posting was for District employees only. Silverman Decl. at Ex. HH. Accordingly, Greene did not reapply. Defs. 56.1 Statement at ¶ 74.

In response to the second posting, Jack Farnetti and William Dargan applied for the position. *Id.* at ¶ 75. Farnetti, who had served as an Assistant Principal at the High School for six years, was interviewed by the committee. *Id.* at ¶¶ 75, 84; *see* Silverman Decl. at Ex. E, 64:9–10. Dargan, who was retired, was not interviewed. *Id.* Before Jones could make her recommendation, the District also posted a notice for the position of Assistant Principal of the Evening High School, the position that would become available upon Greene's retirement. Defs. 56.1 Statement at ¶ 78. Seven people applied for that job and three were interviewed. *Id.* at ¶¶ 78–79. The three people interviewed, namely Al-

---

**16.** Denis Bracco, who held the position, had advised the Board that he intended to retire at the end of the 2008–2009 school year before

the Nunez incident had occurred. *See* Silverman Decl. at Ex. DD.

exander Richardson, Mark Ingram and Joseph Manchester, were all current employees of the district. *Id.* at ¶ 79. After the candidates for Assistant Principal had also been interviewed by the steering committee, they recommended Farnetti and Escorbores for the Principal position and Richardson and Ingram for the Assistant Principal position. *See* Silverman Decl. at Ex. JJ. Escorbores then withdrew his application. Defs. 56.1 Statement at ¶ 82; Pl. 56.1 Counter–Statement at ¶ 82. Accordingly, in June, Farnetti was the sole candidate interviewed by the Board and was offered the position starting July 1, 2009. Defs. 56.1 Statement. at ¶ 83. Richardson, who is African–American man, was appointed to replace Greene. *Id.* at ¶ 85.

Based on all of these events, Greene alleges in her complaint that the defendants (1) wrongly disciplined and terminated her, denied her consideration for tenure, and denied her a promotion because of her race in violation of Title VII, (2) denied her the promotion because of her gender in violation of Title VII, (3) retaliated against her by limiting her duties and responsibilities after she complained about the disparate and discriminatory treatment in violation of Title VII, (4) denied her tenure and the promotion because of her religion in violation of Title VII, (5) deprived her of equal protection by disciplining and terminating her, changing her work assignments, and creating a hostile work environment in violation of 42 U.S.C. § 1981, (5) and deprived her of equal protection by denying her the promotion, tenure and continued employment in violation of 42 U.S.C. § 1983. In her memorandum, Greene summarizes her claims, alleging that "she was being discriminated against in order to block her tenure and further deny her a promotion to Principal EHS." Pl. Opp. at 1.

The defendants now move for summary judgment on the following grounds: (1) the Jones' recommendation was not an adverse action; (2) Greene was not qualified for the Principal job given the fact that she had resigned and would be retired as of the start date for the position; (3) the District had legitimate and non-discriminatory reasons for its actions; and (4) Greene has not presented any evidence of a pretext for their actions.

## DISCUSSION

### A. Summary Judgment Standards

" 'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.' " *Puglisi v. Town of Hempstead,* 2012 WL 4172010 *6, 2012 U.S. Dist. LEXIS 133281 *15 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.P.,* 153 F.3d 61, 67 (2d Cir.1998) and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996), *cert denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997).

The trial court's responsibility is " 'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.' "

*Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish Removal Co., Inc. v. Ferguson,* 85 F.Supp.2d 174, 180 (E.D.N.Y.2000) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548). A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.,* 61 F.Supp.2d 81, 88 (S.D.N.Y.1999). With these standards in mind, the court addresses the pending motion.

## B. Greene's Title VII Claims

### 1. Applicable Law

■ Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Richardson v. Commission in Human Rights & Opportunities,* 532 F.3d 114, 119 (2d Cir.2008). Greene contends that she was discriminated against on the basis of her race, gender and religion. Specifically, Greene asserts that she was wrongfully disciplined, terminated, denied consideration for tenure and denied a promotion because of her race. *See* Complaint at ¶ 108–113.

She also asserts that was denied the promotion because of her sex. *Id.* at 114–117. Finally, she asserts that she was denied consideration for tenure, constructively discharged and denied the promotion because of her religion. *Id.* at ¶ 124–129. "The ultimate issue' in any employment discrimination case is whether the plaintiff has met her burden of proving that the that the adverse employment decision was motivated at least in part by 'impermissible reason, i.e., that there was discriminatory intent.' " *Weisbecker v. Sayville Union Free Sch. Dist.,* 890 F.Supp.2d 215, 231 (E.D.N.Y.2012). Since Greene's race, gender and religion claims overlap, the court will address them together.

#### a. Direct Evidence of Discrimination

■ Courts generally apply the *McDonnell Douglas* burden-shifting analysis to discrimination claims such as these "to assure that the 'plaintiff [has her] day in court despite the unavailability of direct evidence.' " *Short v. Manhattan Apartments, Inc.,* 916 F.Supp.2d 375, 396 (S.D.N.Y.2012) (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). "However, '[t]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. To avoid the burden-shifting analysis, 'the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support [her] allegations of discriminatory treatment.' " *Id.* at 396 (citing *Raskin v. Wyatt Co.,* 125 F.3d 55, 61 (2d Cir.1997) (internal citations omitted)). Here, Greene has not presented the type of evidence needed to circumvent the *McDonnell Douglas* framework.

Greene contends that she has offered direct evidence of discrimination, that is, proof of Talley's racial and sexual ani-

mus.[17] Her evidence includes, she says, accounts of Talley's derogatory statements about minorities and women such as referring to Jones as "that black bitch," to another board member as "a dumb nigger," or to another female board member as "a fat ugly cunt." However, Greene has pointed to no admissible evidence to support her contentions. Greene's alleged proof of racial and gender animus is gleaned, in large part, from the depositions of O'Brien and Jones. During O'Brien's deposition, Greene's counsel engaged in the following colloquy:

Q: I'm going to read to you several statements that Frank Scimeca has made in a sworn affidavit and ask you if you have any reason to disbelieve anything that he's quoted as saying.... [18]

Q: Mr. Scimeca states in his [affidavit], quote:

(Reading) "Talley referred to board member Gail Kirkman as, quote, "Another dumb nigger," closed quote....

A: And the question that your asking me is?

Q: Do you have any reason to disbelieve that Mr. Talley made this statement to Mr. Scimeca?

A: I would find it hard to believe that he was that stupid....

Q: Another quoted (sic.) that Mr. Scimeca makes in his sworn affidavit, he is referring to a conversation with Talley and he says:

(Reading) Talley reached for my arm and said, quote, "Frank, be careful whose side you chose to be on, because that black bitch, Donna Jones, on the third floor, doesn't know who she is dealing with, and when I am done using her, I will throw her black ass out in the street where she belongs," closed quote.

Any reason to disbelieve that Mr. Scimeca was not being truthful and forthright in his statement as to what Talley said? ...

A: I have no reason to disbelieve Mr. Scimeca.

Gilliam Decl. at Ex. TTT 150:19–154:24.[19]

Similarly, Greene's counsel asked Jones:

Q: Having just described Mr. Embree's[20] work performance and issues with his attendance, I am going to read you a quote from [Mr. Scimeca's] sworn statement [about Mr. Talley], and ask

17. Although Greene targets Pace as one of the ring leaders, Greene has not offered any direct evidence that Pace's conduct was influenced by discrimination. Nor has Greene offered any direct evidence of religious discrimination. As defendants have noted in their memorandum, Greene's sole evidence of religious discrimination is that when she whispered a psalm to Jones, she looked at her "as if [she] had two heads" and that Greene heard people "snickering" in meetings she attended. Def. Mem. at 12–13; Silverman Decl. at Ex. D. 56–58, 144–47.

18. Frank Scimeca is the Director of Buildings and Grounds. Gilliam Decl. at Ex. TTT at 59:20. He is not a party to this lawsuit. It appears that the affidavit may have been prepared by Scimeca in connection with an unrelated lawsuit.

19. Greene also refers to O'Brien's testimony that he personally heard Talley make a comment about Christopher Dowdy's race when he applied for Assistant Principal of the Middle School. See Silverman Decl. at Ex. K, 84:16–85:20. Specifically, O'Brien recalls Talley saying "So you are telling me after two years, I will forget that he is black." Id. While Talley's statement could be considered by the court as evidence of the defendants' pretext, the comment is a "stray remark" not aimed at Greene. See Chuang v. T.W. Wang, Inc., 647 F.Supp.2d 221, 238 (E.D.N.Y.2009) ("[R]emarks made in past expressing a desire to hire younger subordinates are stray remarks insufficient to support a discrimination suit.")

20. Mr. Embree is a custodian who is married to one of the board members.

you if this is something you believe, knowing Mr. Talley, that he would have made a remark about.... Talley called one board member Suzanne Belanger–Embree quote, a fat ugly cunt who will vote the way I tell her to vote....

A: The question is—

Q: ... would this statement be something that you would consider to be in line with what the sentiment was that Mr. Embree didn't report to work, he didn't have to because his wife was on the board?

...

Q: Can you answer the question, please?

A: Yes....

Gilliam Decl. at Ex. MMM 141:18–142:24. In her deposition, Jones was also read a statement in which Talley was said to have referred to her as a "black bitch" and she indicated that she believed it was something Talley would have said to Scimeca. Gilliam Decl. at Ex. MMM 142:25–144:4.

The testimony of O'Brien and Jones commenting on the affidavit of a co-worker in which he reiterates derogatory statements allegedly made by Talley is inadmissible hearsay.[21] Moreover, even if the comments were admissible, the comments, although inappropriate, are not probative of the defendants' motive for taking action against Greene. *See Shepard v. BCBG*

*Max Azria Group, Inc.*, 2012 WL 4832883, at *17, 2012 U.S. Dist LEXIS 146772 *65–66 (S.D.N.Y. Oct. 11, 2012) (citing, *inter alia, Dixon v. Int'l Fed'n of Accountants*, 2010 WL 1424007, 2010 U.S. Dist. LEXIS 35348 (S.D.N.Y. Apr. 9, 2010) ("co-worker's comment at a meeting that 'she can't believe that [defendant] could hire a black Jamaican women at 48 years of age' held to be 'at best ambiguous as to whether it met the test for discriminatory animus....' "); *Renz v. Grey Adver., Inc.*, 135 F.3d 217, 224 (2d Cir.1997) ("granting summary judgment to employer because plaintiff's sole evidence of discrimination consisted of isolated remarks by decisionmaker that, although inappropriate, were not directed at plaintiff"); *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, 2007 WL 1149979, 2007 U.S. Dist. LEXIS 28274 (S.D.N.Y. Apr. 18, 2007) ("inappropriate gender related remarks made by male supervisor but not directed at female plaintiff were 'insufficient to demonstrate that adverse actions taken against the plaintiff [were] attributable to gender bias' ")).

Greene also refers to a chart prepared by defense counsel listing other complaints of discrimination against the District and Talley.[22] While, the direct testimony of other employees about their treatment by the defendants may be relevant to the issue of the employer's intent, *see Zubulake v. UBS Warburg, LLC*, 382 F.Supp.2d

**21.** Greene has also produced two newspaper articles in which Talley was criticized for using code words at a board meeting like "outsiders and taking care of our own" and suggesting that the Salvadorian community needs to help go after the MS–13. Gilliam Decl. at Ex. W. The newspaper articles are also inadmissible hearsay having no correlation to the employment decisions at issue. As an aside, the first comment was arguably taken out of context. Talley is quoted as stating that his comment "taking care of our own" referred to taking care of Brentwood's employees and students. Talley's "controver-

sial" comment concerning the MS–13 was made at a board meeting addressing a series of recent killings in Brentwood. Talley said "When the Italians had the Mafia, the Italians brought them down. You can't take an Irishman and expect him to turn MS–13 out. You need people from the Salvadorian community to go after the Salvadorians." *Id.* There is nothing in the article to remotely suggest animus toward African–Americans, women or Christians.

**22.** In her complaint, Greene references two of the lawsuits. *See* complaint at ¶¶ 103–04.

536, 545 (S.D.N.Y.2005), the complaints, themselves, are also inadmissible hearsay. *See Richmond v. General Nutrition Ctrs., Inc.*, 2012 WL 762307 *9, 2012 U.S. Dist. LEXIS 32070 *30 (S.D.N.Y. Mar. 9, 2012). Moreover, the minimal information that has been provided about the circumstances underlying those complaints is not enough for the court to assess whether that the type of discrimination directed at those plaintiffs was similar to the discrimination allegedly experienced by Greene. *See Zubulake*, 382 F.Supp.2d at 545. Accordingly, since the only "direct evidence" presented by Greene are hearsay statements unrelated to the events at issue, the court must proceed with a *McDonnell Douglas* analysis.

### b. McDonnell Douglas Framework

■ Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination by showing that she (1) belonged to a protected class, (2) was qualified for the position she held or sought, (3) suffered an adverse employment action, and (4) did so under circumstances giving rise to an inference of discriminatory intent.[23] *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003). If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Stratton v. Department for the Aging*, 132 F.3d 869, 879 (2d Cir.1997).

■ The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester*

*City Sch. Dist.*, 192 F.Supp.2d 100, 111 (W.D.N.Y.2002) (citing, *inter alia, Meiri*, 759 F.2d 989, 995 (2d Cir.1985)). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir.1987)), and may not "sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988).

■ If the employer establishes a legitimate nondiscriminatory reason for its actions, the *McDonnell Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In order to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors."

---

**23.** The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med.* *Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir.2001).

*Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995); *see Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004). However, to withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.,* 853 F.2d 151, 155 (2d Cir.1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

■ Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Cntr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998) ("the thick accretion of cases interpreting the burden shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases ... the plaintiff has the ultimate burden of persuasion"). With these standards in mind, the court will address Greene's collective Title VII allegations.

**2. Greene's Race, Gender and Religious Discrimination Claims**

As stated above, Greene alleges that the defendants wrongfully disciplined and terminated her, denied her an extension of her probationary period, denied her consideration for tenure and denied her a promotion because she is an African–American, Christian woman. The defendants do not dispute that Greene was a member of a protected class with respect to each of her claims. They do dispute, however, that she suffered an adverse employment action with respect to the Nunez incident and that she was qualified for the position of Principal of the Evening High School. Moreover, the defendants contend that they had legitimate nondiscriminatory reasons for recommending her termination and denying her a promotion and that Greene has failed to present sufficient evidence that the reasons they have articulated for their decisions are a pretext.

**a. The Adverse Employment Actions**

■ "A plaintiff suffers an adverse employment action when she experiences a "materially adverse change in the terms and conditions of employment." Typical adverse employment actions may include termination from a job, decrease in salary, material reduction in benefits or responsibilities, or a less distinguished title." *Weisbecker,* 890 F.Supp.2d at 233 (internal citations omitted). Greene argues in her opposition papers that she has experienced an adverse employment action because had she not resigned and retired from her position, she would have been terminated. Pls. Opp. at 16. Greene also contends that the District's decision to deny her tenure, rather than to extend her probationary period, as an alternative to the recommendation to terminate, is a covered activity under Title VII. *Id.* at 17. Although Greene characterizes the defendants' conduct as distinct adverse actions, it is clear that these actions are one and the same.

■ The defendants never voted on Greene's termination or discussed her eligibility for tenure. In fact, she was not eligible for tenure consideration until September 1, 2009. *See* Gilliam Decl. at Exs. H, Q. The only action taken by the defendants was Jones' recommendation to terminate Greene's employment and that recommendation does not constitute an adverse employment action. *Weisbecker,*

890 F.Supp.2d at 233–34. As Judge Bianco noted in *Weisbecker:*

> Threats of termination do not, by themselves, constitute an adverse employment action as a matter of law.... This is especially true, ..., where (1) the recommendation was made by [a person], who was not the final decision maker with respect to termination, (2) plaintiff was notified of the recommendation of termination well in advance of the Board's meeting, and (3) plaintiff was afforded extensive process under New York Education Law § 3031 to request [the] reasons for the recommendation and provide a responsive statement to the Board. As such, as a matter of law, [a recommendation of termination is] not an adverse employment ....

*Id.* at 233 (internal citations omitted).[24] As in *Weisbecker,* Greene was advised by Jones, who was not the final decision maker, that she would be recommending her termination well in advance of the February board meeting and was given an opportunity to request the reasons for her recommendation. In addition, before Jones could respond or the Board could vote on the recommendation, Greene resigned.

Similarly, Greene was not considered for tenure because she resigned before she became eligible. Greene was not eligible for tenure consideration until the 2009–2010 school year. *See* Gilliam Decl. at Exs. H, Q. She submitted her resignation on February 5, 2009, effective July 1, 2009. There is not a shred of evidence suggesting that before the Nunez incident, the Board had already begun to consider Greene's eligibility for tenure or that their desire to deny her of that privilege somehow influenced Jones' decision. *Compare Curcio v. Roosevelt Union Free Sch. Dist.,* 2012 WL 3646935, *7, 2012 U.S. Dist LEXIS 120144 *22 (E.D.N.Y. Aug. 22, 2012) (SJF) (where defendants conceded that recommendation of denial of tenure was an adverse action).

■ Nor can the recommendation be considered a constructive discharge. "For a court to consider constructive discharge a plaintiff must show that employer 'intentionally create[d] a work atmosphere so intolerable that [the employee] is forced to quit involuntarily.'" *Madray v. Long Island University,* 789 F.Supp.2d 403, 409 (E.D.N.Y.2011) (citing *Terry v. Ashcroft,* 336 F.3d 128, 151–52 (2d Cir.2003)). Greene contends that "[t]he accumulative effect of individual acts by Lange [and] Jones were so pervasive that plaintiff's work environment was so severe that she was forced to retire." Pl. Opp. at 22. A review of the record indicates that these actions did not, however, create the type of atmosphere that would have compelled a reasonable person in Greene's shoes to resign. Greene could have waited for Jones' explanation and submitted a response directly to the Board before submitting her resignation.[25] Instead, Greene chose to respond to the allegations fifteen days after she had already submitted her notice of resignation.[26]

---

**24.** In *Nagle v. Marron,* 663 F.3d 100, 106 (2d Cir.2011), the Second Circuit noted, in *dicta,* that a decision to recommend termination and not to recommend tenure was an adverse employment action. However, the defendants in *Nagle* conceded that the plaintiff had suffered an adverse employment action.

**25.** Greene has offered no evidence to support her allegation that she would not have gotten a retirement package unless she retired immediately. *See* Complaint at 89.

**26.** Greene met with O'Brien repeatedly between January 22 and February 5, to weigh her options, and after doing so, decided it was in her best interest to resign due to the negative implications of termination. *See Weisbecker,* 890 F.Supp.2d at 235; *Murray v. Town of N. Hempstead,* 853 F.Supp.2d at 268–70

Accordingly, whether you characterize the defendants' actions as a disciplinary action taken by Jones, an "attempt to block her tenure," or a constructive discharge, Greene did not suffer an adverse employment action with respect to the Nunez incident.

### b. Qualification for the Promotion

With respect to Greene's application for the Principal position, the defendants do not dispute that the failure to promote is an adverse employment action. *See Bir v. Pfizer, Inc.*, 510 Fed.Appx. 29, 31–32 (2d Cir.2013). They argue, instead, that Greene has failed to establish a *prima facie* because she was not qualified for the job. In this regard, the defendants contend that the position started on July 1, 2009, the same day the Greene was due to retire. *See* Silverman Decl. at Exs. CC and FF. Pursuant to Section 211 of the New York State Retirement and Social Security Law, "[n]o retired person may be employed in a position in public service . . . except upon approval of . . . the commissioner of education." N.Y. Retire & S.S. § 211(2)(a)(2). Moreover, to obtain approval from the Commissioner of Education, the District must file a written request for approval, which certifies, among other things, "[t]hat the district . . . has undertaken an extensive and good faith recruitment search for a certified and qualified candidate and determined that there are no available non-retired persons qualified to perform the duties of such position." * N.Y.C.R.R. § 80–5.5(c)(2)(i).

Greene does not, and could not, dispute the existence of the retirement barrier in this case. It is undisputed that the Board had already voted to accept her resignation, effective July 1, 2009, the start date for the position. It is also undisputed that Jack Farnetti, who was hired for the position, was not retired and was qualified for the job having served as an Assistant Principal at the High School for six years. Defs. 56.1 Statement. at ¶¶ 75, 84; *see* Silverman Decl. at Ex. E, 64:9–10. Nonetheless, she argues that since she was still employed when the District interviewed for the position, the Board could have rescinded its decision to accept her resignation. It is clear, however, that Greene never made such a request to the Board. Moreover, while Greene argues that she was the better candidate for the position, and therefore, should have been considered, Farnetti was certainly a qualified candidate as defined by the New York State Education Department. Therefore, the court agrees that given her resignation and retirement status as of July 1, 2009, Greene was not qualified for the position.

Accordingly, Greene has not established a *prima facie* case for race, gender or religious discrimination with respect to Jones' recommendation of termination or the promotion, and no reasonable jury could find otherwise.[27]

### c. No Inference of Discrimination

■ Even if Greene could establish a *prima facie* case, Greene's discrimination

---

(E.D.N.Y.2012) (finding no constructive discharge as a matter of law where threat of termination was not direct and separation resulted after month long negotiation)); *compare Grey v. City of Norwalk Bd. of Education.*, 304 F.Supp.2d 314, 324 (D.Conn.2004) (repeated threat of termination was coupled with other adverse conduct).

27. Having found that Greene has not suffered an adverse employment action with respect to the Nunez incident and was not qualified for the promotion to Principal, the court has not addressed the last element of the *prima facie* case, that is, whether there was an inference of discrimination. It has, nonetheless chosen, to address the balance of the *McDonnell Douglas* analysis should the District Court disagree with its initial findings.

claims would not survive a motion for summary judgment because the defendants have articulated a nondiscriminatory reasons for their actions and there is no evidence of a pretext. As was previously stated, under the *McDonnell Douglas* framework, once a plaintiff establishes a *prima facie* case "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Weisbecker*, 890 F.Supp.2d at 232 (citing *Stratton v. Department for the Aging for the City of New York*, 132 F.3d 869, 879 (2d Cir. 1997)). The defendants, here, have introduced admissible evidence to establish that they had a legitimate nondiscriminatory reason to recommend Greene's termination rather than extend her probationary period and to deny her a promotion. To begin with, a thorough investigation was conducted by Lange, which revealed that Greene had exercised poor judgment in her handling of the Nunez incident. *See* Silverman Decl. at Exs. V at 656; Z. That conclusion, in and of itself, was a legitimate basis to recommend Greene's termination. The defendants have also set forth two legitimate nondiscriminatory reasons for denying Greene a promotion, those being, that (1) Greene was ineligible for the job because she was due to retire on the same day and (2) the District could not have "in good conscience" given her a promotion on the heels of the Nunez incident. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir.) (defendant need only offer an explanation for the decision); *Patria v. East Hartford Bd. of Education*, 2009 WL 840667 *10–11, 2010 U.S. Dist LEXIS 125270 *29–30 (D.Conn. Mar. 31, 2010) (defendants provided legitimate nondiscriminatory reason for discipline where plaintiff placed student in danger by failing to report complaint about assistant coaches misappropriate behavior with student). Accordingly, the court turns its attention to the defendants' motivation for their conduct.

### i) Greene's Evidence of Pretext

■ To establish that the defendants' explanations for its decisions were a pretext, Greene begins by relying on the same evidence that she offered in support of her *prima facie* case, namely, "Talley's racial animus." *See Weisbecker*, 890 F.Supp.2d at 232 (plaintiff may rely on evidence presented to establish her prima facie case as well as additional evidence). "At the pretext stage, 'a Title VII plaintiff . . . may offer evidence of remarks made by the employer at or about the time of the adverse action 'to show that the decisionmaker was motivated by the discriminatory sentiment expressed in the remark.' '" *Ingenito v. Riri USA, Inc.*, 2013 WL 752201 *11, 2013 U.S. Dist. LEXIS 27333 *38 (E.D.N.Y. Feb. 27, 2013). As noted *supra*, however, Greene's evidence of Talley's racial animus was inadmissable hearsay.

■ Greene's contention that Talley controlled the Board and Jones, acting as the "defacto personnel department" when the decision was made to recommend her termination is also not supported. Greene has not offered any evidence on which a reasonable person could infer that "Lange was being unreasonable harsh and taking an untenable position" when she conducted the investigation. Pl. Opp. at 21. Greene disputes that she told K to hang up the phone and Mrs. Nunez that she could not call an ambulance. She also argues that, notwithstanding Lange's findings, she did what was supposed to do: "[s]he followed the chain of command, alerted security, who advised her that the ambulance had already been called, she inquired of the student why she was spitting up blood, . . . she ensured that the student was stable

and able to walk to the front office ..., she contacted the student's parent ..., she wrote up a report ... and she complied with Central Administration's request for a report." But these contentions, even if true, do not prove that the defendants had a discriminatory motive when they found that she had used poor judgment.[28] *See Rodriguez v. City of New York*, 644 F.Supp.2d 168, 187 (E.D.N.Y.2008) (even evidence that an investigation was faulty does not automatically demonstrate that the defendants' proffered reasons for its decision to recommend termination were a pretext).

Nor is there any evidence that Jones was being pressured by Talley and Pace to terminate Greene before the investigation had begun. Pl. Opp. at 21. While it is undisputed that Talley and Pace both thought that Greene should be terminated after the Nunez incident, and communicated their feelings to Jones, she did not immediately adopt there viewpoint. In fact, the record is clear that Jones struggled with the decision:

Q: During any conversation you had with Mr. Talley, did he ever express to you that he was seeking Miss Greene's termination? ...

A: Yes ...

Q: Can you tell me the sum and substance of this conversation with Mr. Talley where you said that he indicated that he was seeking Miss Greene's termination?

A: I told him I was very conflicted....

Q: What do you mean by that?

A: Because I knew that Mrs. Greene had been an employee of the district for many, many years and that I was never aware of any problem with her job performance ....

However, I was conflicted because I felt that based on the investigation and the report that I received, it appeared that there were judgment calls that were questionable. So I was very conflicted in terms of what should be done.

Q: Did Mr. Talley have any response to you stating you were conflicted about the action to that should be taken against Greene?

A: Yes. He was very strongly committed to termination.

Q: Was there any other board member around this time that had expressed to you they were strongly committed to Miss Greene's termination?

A: Lorraine Pace....

Q: In sum and substance what did she say to you ....

A: She should be fired. That kid nearly died.

Gilliam Decl. At Ex. MMM, 156:3–158:8. Jones further testified that the reports that she had received suggested that "there was no remorse for the incident ... and there was a serious concern of judgment, poor judgment that could have led to a very serious situation involving a child." *Id.* at 160:18–25. Accordingly, while Jones, who initially advocated for Greene, may have been influenced by the viewpoints of Board members, there is no evidence to suggest that her ultimate decision was motivated by discrimination.

### ii) Greene's Claim of Disparate Treatment

Likewise, Greene has not offered sufficient evidence to support her contention that she was treated differently with re-

28. Coleman's and Jimenez's only involvement in this matter appears to be their vote in favor of accepting Greene's resignation. Greene did not sue the three other Board members who voted against accepting her resignation.

spect to the disciplinary measures than other similarly situated employees. Greene avers that the defendants' response to the "serious conduct" of employees David Reuben ("Reuben"), Jose Suarez ("Suarez"), Vincent Palumbo and Bergre Escorbores ("Escorbores") are examples of the disparate treatment. Specifically, Greene claims that each of these men received lesser penalties for their conduct although in many ways their conduct was more severe.

 While "evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer in a Title VII context are pretextual," *see Summa v. Hofstra*, 708 F.3d 115, 130 (2d Cir.2013), a plaintiff who seeks to establish disparate treatment must show that the employee to whom she compares herself is "similarly situated in all material respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir.2001). In this context, the Second Circuit has explained:

> What constitutes "all material respects" ... varies somewhat from case to case and, ... must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness.... Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical....

The determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated.

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000) (internal quotation marks and citations omitted).[29] With these principles in mind, the court examines whether the conduct of these employees was of comparable seriousness.

 The record reflects that Reuben, a white-male, Assistant Principal, who was accused of making inappropriate sexual statements to a student was placed on home assignment and permitted to resign his position. He was then reassigned to the position of teacher/dean rather than being terminated. Gilliam Decl. at Ex. JJJ. However, the investigative report concluded that the student's claims of sexual misconduct were "unbelievable." *Id.* In addition, Reuben was later terminated for a unrelated incident, and thus, received a comparable, if not more severe, punishment for his conduct. *Id.*

 Palumbo, a social worker/dean, who was alleged to have harassed students and teachers, was placed by Jones on administrative leave pending an investigation. *Id.* at MMM 87:13. Greene urges the court to consider that despite his serious conduct "Jones was blocked by the board from terminating [Palumbo] and had to settle for referring him to counseling." However, the record reflects that the Board could not terminate Palumbo be-

---

**29.** "The question of whether two employees are similarly situated is generally a triable issue for the fact finder. Nonetheless, a plaintiff must offer sufficient evidence from which a jury could reasonably conclude that there was indeed disparate treatment of similarly situated employees." *Pierre v. New York State Dep't of Correctional Servs.*, 2009 WL 1583475, at *12 (S.D.N.Y. June 1, 2009) (internal quotation marks and citations omitted); *see Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499–500 n. 2 (2d Cir.2001) "[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assoc.*, 273 F.3d at 499–500 n. 2.

cause the time to do so had expired. *Id.* at 78:20. Greene similarly contends that the Board protected Suarez, a Hispanic Principal, who was accused of being aware of the alleged harassment of employees by Palumbo. Suarez's conduct, however, did not involve a student; rather, Jones felt that he was not supportive of the teachers who brought Palumbo's conduct to his attention. Yet, Jones recommended the same discipline for Suarez as she had for Greene. However, unlike Greene, Suarez did not resign upon receipt of the recommendation enabling the Board to consider and vote on Jones' recommendation for his termination. *Id.* at 77:19.

Finally, Greene alleges that Escorbores was involved in inappropriate conduct which could have led to his termination and the Board agreed to extend his probationary period for a fourth year. Gilliam Decl. at Ex. SS; Pl. Opp. at 19. While it is clear from the record that Escorbores' probationary period was extended, the court in unable to determine from the record whether his conduct was of comparable seriousness. Therefore, Reuben, Palumbo, Suarez and Escorbores are not proper comparators.

Greene's claim that she was disparately treated with respect to the promotion is also unavailing. In support of this allegation, Greene contends that because she is an African–American, Christian women, she was not even interviewed for the job, whereas Farnetti, who was less qualified, was promoted because he was a white man. A review of the record demonstrates the following. Initially, two men applied for the position along with Greene, namely DeConstanzo and Escorbores.

Defs. 56.1 Statement at ¶ 71. DeConstanzo and Escorbores were interviewed by the screening committee led by Lange, but Greene was not. *Id.* at ¶ 71. In May, the District re-posted the notice for the position indicating that prior applicants need not reapply. *Id.* at ¶¶ 73, 74. Following, the posting Farnetti and Dargan applied. *Id.* at ¶ 75. The screening committee determined that Dargan was not eligible for the position because he had retired.[30] After the interviews were conducted, the screening committee eliminated DeConstanzo from consideration and recommended Farnetti and Escorbores to the Superintendent.[31] *Id.* at ¶ 75. Escorbores then withdrew his candidacy and Farnetti was interview by the Board and appointed to the position. *Id.* at ¶¶ 82, 83.

Greene argues that the fact that Lange, who she and others viewed as uncharacteristically harsh regarding the Nunez incident, was willing to even interview Escorbores and DeConstanzo shows that other employees were treated more favorably. This argument is utterly without merit. Greene has presented no evidence to show these candidates had engaged in conduct that should have effected their employment prospects. Greene only offers that Escorbores' probationary term had been extended prior to his application, but as discussed, *supra*, the circumstances leading up to the extension are not part of the record before the court. *See Tu v. Oppenheimer Funds, Inc.*, 2012 WL 516837, at *6, 2012 U.S. Dist. LEXIS 19867 *17 (S.D.N.Y. Feb. 15, 20120) ("When the conduct reflects 'no hint as to any [discriminatory] reason,' and '[a]ttributing the reason to race [or gender] would be based entirely

---

**30.** Greene's attempt to distinguish herself from Dargan because he was already receiving retirements benefits when he applied is unavailing. The fact remains that the District was not considering retirees.

**31.** Greene notes that Bracco did not recommended Escorbores for the position. *See* Gilliam Decl. at Ex. GG.

on speculation,' a plaintiff does not defeat a motion for summary judgment."). Moreover, Lange, and the screening committee, considered interviewing Greene when they realized that DeConstanzo's retirement status was questionable because they had already interviewed him. *See* Gilliam Decl. at Ex. GG. But, it appear that they verified that he was not a member of the retirement system. *Id.*

There is also no merit to Greene's claim that Talley forced Escorbores to withdraw his application, to pave the way for a white candidate. The only evidence offered by Greene to support her contention is Jones' testimony in which she recalls "some conversation" between Talley and Escorbores that was influential in his decision. *See* Gilliam Decl. at Ex. at MMM 146:24. However, to dispel any notion that Escorbores was forced out by Talley, Escorbores has provided a sworn affidavit to the court in which he states that he withdrew his application because of personal commitments and was not influenced by Talley. *See* Silverman Decl. at Ex. MM.

 Greene also argues in support of her allegation of disparate treatment that she was more qualified for the position. Greene does not dispute that Farnetti had "longevity in the District," having served as an Assistant Principal for six years, twice as long as she had. Rather, Greene argues that one can infer discrimination from the fact that Farnetti did not have experience in the EHS program areas and later had difficulty handling a state audit and a riot with stabbings. This argument is simply unavailing. "An employee's own assessment of [her] work performance is insufficient to establish pretext." *Stevens v. New York*, 2011 WL 3055370 *7, 2011 U.S. Dist. LEXIS 80300 *22 (S.D.N.Y. July 20, 2011).

 Finally, "courts in this circuit have noted that diversity in a defendant's staff undercuts an inference of discrimination." *Subramanian v. Prudential Securities, Inc.*, 2003 WL 23340865 *8, 2003 U.S. Dist. LEXIS 23231 *23 (E.D.N.Y. Nov. 20, 2003). As previously noted, from 2004 to 2011, the District hired nineteen minority individuals as principals and assistant principals, although none, as Greene points out were hired as the Principal of the Evening High School. Defs. 56.1 Statement at ¶ 93. Of these nineteen individuals, ten individuals appear to be African–American. *Id.* at ¶ 94. In addition, from 2008 to 2011, the District employed twenty-three females as principals or assistant principals. *See* Silverman Decl. at Ex. OO, Resp. 2.

In sum, Greene has not submitted any evidence that the defendants' reasons for their decisions to recommend her termination or deny her a promotion were merely pretextual. Accordingly, the undersigned recommends that Greene's Title VII race, gender and religious discrimination claims be dismissed.

### 3. Greene's Retaliation Claim

The defendants also seek summary judgment with respect to Greene's retaliation claims. In her complaint, Greene contends that the defendants retaliated against her after she complained of "race" discrimination and "continued said retaliation after [she] complained about disparate treatment based on the disciplinary action taken against her and her forced retirement." Complaint at ¶ 119. Specifically, Greene stated in her February 20, 2009 rebuttal letter to Jones, "I believe this incident is a pretext to obtain my early retirement for discriminatory reasons." Gilliam Decl. at Ex. Y. She also alleges that the community complained about her discrimination at the November 24, 2008

board meeting.[32] In her memorandum, Greene adds that she complained about discrimination in a meeting with Jones, Lange and O'Brien.[33] She says that, as a result of these complaints, the defendants "significantly limit[ed] her duties and responsibilities and creat[ed] a hostile work environment."[34] *Id.* at ¶ 120.

 To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she participated in an activity protected under Title VII; (2) the employer was aware of her participation in the protected activity; (3) the employer took adverse action against her based on her protected activity; and (4) there was a causal connection between the protected activity and the adverse action taken by the employer. *Kessler v. Westchester County Dep't of Social Servs.*, 461 F.3d 199, 206 (2d Cir. 2006). The "protected activity" element of a retaliation case turns upon whether the employee has protested an unlawful employment practice, within the meaning of Title VII.[35] *Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 135 (2d Cir.1999).

 The record is devoid of evidence that the defendants limited Greene's duties or responsibilities after she complained

about discriminatory behavior. In her deposition, Greene avers that she was not allowed to attend an ELS meeting with state representatives or to take a course in the computer department. Silverman Decl. at Ex. D, 120:18–121:8. However, there is no evidence to support her testimony or explain why she might have been excluded from those two events. Although Greene contends that Bracco told her she could not attend the ELS meeting, Greene does not recall if Bracco said why and neither Bracco nor O'Brien have any recollection of her ever complaining that she was not allowed to attend meetings, functions or workshops. *Id.* at Ex. L, 54:7–23; Ex. K, 73:8–25. Greene also does not recall when she was notified that she could not attend a computer class or whether it was after she had already submitted her resignation. *Id.* at Ex. D, 123.

 With regard to the hostile work environment, Greene explained at her deposition that "somebody [at work] said, 'Don't use your phone because it's tapped.' It just became a very hostile work environment." *Id.* at Ex. D, 121:6. However, she does not recall who told her not to use the phone or whether it was said to her in

32. The only evidence offered by Greene in support of this contention is a fleeting reference to the meeting in an e-mail from O'Brien in which he states "When asked at the meeting if the Board would reconsider, a member responded "Then Billy would win." This statement is not evidence that Greene engaged in a protected activity.

33. At her deposition Greene testified that during a meeting with Jones, Lange and O'Brien, Greene told them that "she felt that she was being discriminated against ... set up, because [she] would have been the first African–American principal on the high school level." *Id.* at LLL 81:19–82:7. Yet, the meeting(s) with Jones, Lange and O'Brien occurred before February 5, and the notice for the position as EHS Principal was not posted until March.

34. Greene does not assert in her complaint that she was denied a promotion in retaliation for her complaints of discrimination after the Nunez incident. The complaint makes clear that the only adverse action she suffered was a limitation of her duties and the creation of a hostile work environment.

35. The practice complained of need not necessarily be illegal under Title VII. Rather, a cause of action may exist so long as plaintiff possessed a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

person. Moreover, she never complained about the incident. *Id.* at 125. She also contends that Bracco "became somewhat distant," she became less involved in the ELS program, and that her job became stressful because she couldn't get coverage if she need a day off without getting permission from central administration. However, at the same time, she admits that she became less involved in the ELS program after she had resigned and that prior to the incident she hadn't taken off days. *Id.* at 125–30, 131–32. This is not the type of conduct that is considered to be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

In short, Greene's Title VII retaliation claim is not supported by sufficient evidence, and thus, the undersigned recommends that it be dismissed.

### C. Greene's Section 1981 Claim

In her fifth cause of action, Greene contends that the defendants violated 42 U.S.C. § 1981 in that they treated her differently than other similarly situated employees as evidenced by (1) the determination of Lange and Jones that she exercised poor judgment and endangered the welfare of a minor, which resulted in their decision to discipline her and seek her termination and (2) the decision of Jones, Talley, Pace, Coleman and Jimenez to force her retirement and thereby eliminate her from consideration for a promotion or tenure. Complaint at ¶¶ 132–134. Greene further contends that the Board and the

District had knowledge of Talley's racial animus and failed to take appropriate measure to disavow such unlawful conduct. *Id.* at ¶ 135.

 Section 1981 provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.[36] As a threshold matter, "Section 1983 provides the exclusive remedy for violation of rights guaranteed under § 1981 in a claim against a state actor." *Gladwin v. Pozzi,* 2010 WL 245575, at *6–7, 2010 U.S. Dist. LEXIS 5091 *16–17 (S.D.N.Y. Dec. 10, 2010), *aff'd* 403 Fed. Appx. 603 (2d Cir.2010). Here, the District and the individual defendants are state actors. *See Carter v. City of Syracuse Sch. Dist.,* 2012 WL 930798 *17, 2012 U.S. Dist. LEXIS 36612 *55 (N.D.N.Y. Mar. 19, 2012). "As such, Section 1981 claims asserting vicarious liability against municipalities must be analyzed in accordance with the principles laid down in *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)." *Burke v. Deer–Park Union Free School Dist.,* 2011 WL 477736 *5, 2011 U.S. Dist. LEXIS 10629 *14 (E.D.N.Y. Feb. 3, 2011). Under *Monell,* a municipality can only be held liable if "its

---

**36.** "To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir. 2000) (citing *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993)).

policy or custom, whether by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the complained injury." *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. Where such a claim is made, the plaintiff must allege facts showing that the official "had final policy making authority in the particular area involved. *Id.* Greene has failed to set forth evidence plausibly suggesting that there was a custom, practice or policy of discriminating against employees based on race, gender or religion. Moreover, even if there was a basis for a *Monell* claim, as discussed *supra,* Greene has also failed to set forth sufficient evidence that she was treated differently from similarly situated individuals with regard to either her discipline or the denial of her promotion, and thus, the court recommends that the Section 1981 claim against the defendants be dismissed.

### D. Greene's Section 1983 Claim

Greene's Section 1983 claim mirrors the Section 1981 claim. Greene contends that the District and the Board's decision to subject her to unwarranted discipline, to force her retirement, to deny her consideration for tenure and to deny her a promotion on account of her race violated her rights to Equal Protection. Complaint at ¶¶ 142–144. Again, for the reasons discussed above, summary judgment on the plaintiffs Section 1983 claim is appropriate and the court recommends that the claim be dismissed.

### OBJECTIONS

A copy of this Report and Recommendation is being served by the Court on all parties. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Wagner & Wagner, LLP*

*v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir.1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir.1996).

Dated: Central Islip, New York, April 9, 2012.